1  Avi Wagner (SBN 226688)
2  THE WAGNER FIRM
   1925 Century Park East, Suite 2100
3  Los Angeles, California 90067
   Telephone: (310) 491-7949
4  Facsimile: (310) 694-3967
5  Email: avi@thewagnerfirm.com

6  *Attorneys for Plaintiff Nilabrata Goswami*
7
8  [Additional Counsel on Signature Page]

9

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

13 NILABRATA GOSWAMI, Individually   Case No.
   and On Behalf of All Others Similarly   SACV12 1753 CJC (MLbtx)
14 Situated,

15             Plaintiff,            **CLASS ACTION**

16                                   **VERIFIED SHAREHOLDER**
17             v.                    **DERIVATIVE COMPLAINT**
                                     **FOR BREACH OF FIDUCIARY**
18 DON M. BAILEY, MICHAEL H.         **DUTY, WASTE OF**
19 MULROY, STEPHEN L. CARTT,         **CORPORATE ASSETS, UNJUST**
                                     **ENRICHMENT, AND**
20 DAVID YOUNG, VIRGIL D.            **CONTRIBUTION AND**
   THOMPSON, MITCHELL J. BLUTT,      **INDEMNIFICATION**
21 and STEPHEN C. FARRELL

22             Defendants,
23
24          -and-                    **DEMAND FOR JURY TRIAL**

25 QUESTCOR PHARMACEUTICALS,
26 INC.,

27             Nominal Defendant.
28

               VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Nilabrata Goswami ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

2.     This Court has jurisdiction over each defendant because each

1    defendant is either a corporation that conducts business in, and maintains

2    operations in, this District, or is an individual who has sufficient minimum

3    contacts with this District so as to render the exercise of jurisdiction by the

4
     District courts permissible under traditional notions of fair play and substantial
5

6    justice.

7          3.      Venue is proper in this Court under 28 U.S.C. §1391(a) because (1)

8
     one or more of defendants reside in, or maintain executive offices in, this district;
9

10   (2) a substantial portion of the transactions and wrongs complained of herein,

11   including the defendants' primary participation in the wrongful acts described

12
     herein, occurred within this District; and (3) defendants have received substantial
13

14   compensation in this District by conducting business herein and by engaging in

15
     numerous activities that have an impact in this District.
16

17         4.      In connection with the acts, conduct and other wrongs alleged in

18   this Complaint, defendants, directly or indirectly, used the means and
19

20   instrumentalities of interstate commerce, including but not limited to, the United

21   States mail, interstate telephone communications and the facilities of the national

22
     securities exchange.
23

24                                      **PARTIES**

25         5.      Plaintiff as set forth in the attached Certification, was a shareholder
26

27   of Questcor at the time of the wrongs complained of, has continuously been a

28   shareholder since that time and is a current shareholder.

                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
                                         - 2 -

6.    Nominal Defendant Questcor is a California corporation with principal executive offices located at 1300 North Kellogg Drive, Suite D, Anaheim, California 92807.  Questcor's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "QCOR."

7.    Defendant Don M. Bailey ("Bailey") was, at all relevant times, the Company's President and Chief Executive Officer.

8.    Defendant Michael H. Mulroy ("Mulroy") was, at all relevant times, the Company's Chief Financial Officer, Secretary and General Counsel.

9.    Defendant Stephen L. Cartt ("Cartt") was, at all relevant times, the Company's Chief Operating Officer.

10.    Defendant David Young ("Young") was, at all relevant times, the Company's Chief Scientific Officer.

11.    Defendant Virgin D. Thompson ("Thompson") was, at all relevant times, a member of the Company's audit committee.

12.    Defendant Mitchell J. Blutt ("Blutt") was, at all relevant times, a member of the Company's audit committee.

13.    Defnedant Stephen C. Farrell ("Farrell) was, at all relevant times, the chair of the Company's audit committee.

14.    The defendants referenced above in ¶¶ 7 through 13 are sometimes referred to herein as the "Individual Defendants." Because of the Individual

Defendants' positions with the Company, they had access to key adverse but undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and through reports and other information provided to them in connection therewith.

15.   It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Questcor, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition as these defendants were involved in drafting, producing, reviewing and/or disseminating the false and

misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16.    As officers and controlling persons of a publicly-held company whose common stock has been, at all relevant times, registered with the SEC under the Exchange Act which is traded on the NASDAQ, and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

17.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and

were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Questcor, each of the Individual Defendants had access to the adverse undisclosed information about Questcor's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Questcor and its business issued or adopted by the Company materially false and misleading.

18.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period. Further, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19.   Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit by

disseminating materially false and misleading statements and/or concealing material adverse facts, which has severely damaged Questcor and its shareholders by extension.

## SUBSTANTIVE ALLEGATIONS

### Background

20. Nominal Defendant Questcor is a company with a single product, a highly specialized, low volume, expensive drug originally approved by the FDA in 1952. It has since been approved for use in 19 indications, but primarily for infantile spasms, a rare seizure disorder affecting about 1,500 infants a year in the U.S. In 1978, Acthar was approved for treatment of MS relapse and was used extensively in the 1970s for that purpose, until corticosteroids came on the market and proved to be a superior alternative.

21. On April 4, 2011, Questcor issued a press release announcing its preliminary first quarter 2011 results. The press release stated the following in relevant part:

> New, paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of exacerbations of multiple sclerosis (MS) during the quarter were greater than 500, up over 115% from the year ago period and up over 40% from the prior quarter.
>
> New, paid prescriptions for infantile spasms (IS) were estimated at 88.
>
> New, paid prescriptions for nephrotic syndrome (NS) were estimated at 18.

2,010 vials of the Company's principal drug, Acthar, were shipped during the quarter ended March 31, 2011.

Gross sales were $48.6 million.

\* \* \*

"The strong performance we saw late in the fourth quarter of 2010 has continued in the first quarter of 2011 and was driven by the increasing productivity of our recently expanded Acthar sales force. March showed significant growth in MS prescriptions and exceeded February's record performance by over 50%. In addition, we are pleased with the very early results from the efforts of our small dedicated Nephrology sales team. While we are very encouraged by the first quarter new prescription results, we note that prior sharp increases in sequential quarterly Acthar prescriptions have usually been followed by more modest sequential growth," said Don M. Bailey, President and CEO of Questcor Pharmaceuticals.

22.    On April 26, 2011, the Company issued a press release announcing financial results for the first quarter ended March 31, 2011.  Specifically, the Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011 as compared to net income of $8 million, or $0.12 diluted EPS, and net sales of $26.2 million for the same period a year ago.  The press release stated the following in relevant part:

The Company's financial performance was driven by a 120% year-over-year increase in the number of new paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of multiple sclerosis (MS) exacerbations. In the first quarter, paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) increased to 18 while prescriptions for the treatment of infantile spasms (IS) were 89, which is within the historic range for IS.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 8 -

"Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing. In addition, during the second quarter we will initiate a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy. Acthar is indicated 'to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus'."

23.    After issuing its first quarter 2011 financials, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey and Cartt further represented the following in relevant part:

[BAILEY:]  In summary, we are off to a very good start this year as we continued to execute our straightforward strategy to sell more Acthar. Our decision to expand the MS sales force is clearly paying off. Also, our nephrotic syndrome sales force is having some early success.

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 9 -

We believe this MS sales performance reflects the strong underlying demand for Acthar. This growth in demand is being driven by the increasing productivity of our expanded sales force.

We believe net sales in the MS market are now about 60% of total Acthar net sales.

* * *

[CARTT:]    Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter, we shipped a record 508 paid Acthar prescriptions, for the treatment of MS relapses. This was an increase of 120% over the year ago period and 44% over the previous quarter.

We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

* * *

[O]ur promotional efforts are increasingly focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients, and two, helping doctors, nurses, and others in their medical practice become more effective at identifying potential Acthar patients.

* * *

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs.

In these programs, existing Acthar prescribers present to small groups of physicians, their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses. When combined with follow-up sales calls, these programs appear to be a key driver of our sales growth.

Recently, we have been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

24.    On April 27, 2011, Questcor filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.    In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.    In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $11.3 million for the three months ended March 31, 2011, as compared to $6.7 million for the three months ended March 31, 2010. The increase of $4.6 million in 2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we doubled the size of our sales organization, increasing the sales force to 77 Acthar specialists and an additional five nephrology sales representatives.

26.    On July 26, 2011, the Company issued a press release announcing financial results for its second quarter ended June 30, 2011.  For the quarter, the Company reported net income of $13.9 million, or $0.21 diluted EPS, and net

sales of $46.0 million as compared to net income of $9.3 million, or $0.14 diluted EPS, and net sales of $28.3 million for the same period a year ago.  The press release stated the following in relevant part:

> 147% year-over-year increase in the number of paid H.P. Acthar® Gel (Acthar) prescriptions for the treatment of multiple sclerosis (MS) exacerbations led to increased shipments of Acthar vials. Paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) also increased sharply in the quarter. In addition, paid Acthar prescriptions for the treatment of infantile spasms (IS) were at the highest quarterly level since the third quarter of 2008.

> "Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow.  Accordingly, growing MS sales remains our number one priority. Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

> "To generate data in support of the expanded nephrology selling effort, we recently initiated a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy," continued Mr. Bailey. "And, today, we are announcing our fourth on-label target market for Acthar, systemic lupus erythematosus. We believe that this market has many of the same characteristics as our other three vertical markets for Acthar--MS, NS and IS."

27.    After issuing its second quarter 2011 financial results on July 26, 2011, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey,

Cartt and Young represented the following in relevant part:

> [CARTT:]  During the quarter we shipped a record 751 paid Acthar prescriptions for the treatment of MS relapses.  This was an increase of 147% over the year-ago period, and 48% over the previous quarter.  We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected.  In addition to rapid growth, our trends at MS are all very good and indicate that we are building momentum in this key Acthar market.
>
> \* \* \*
>
> So let's summarize.  We are very pleased with the robust growth during the quarter and expect continued growth during 2011 and into 2012 as a result of the continued sustained sales call activity. Our early prescription trends in nephrology are surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.
>
> \* \* \*
>
> [BAILEY:]  Our go-forward plan is extremely simple and remains to sell more Acthar.  That is, gross sales in each of our key markets. MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets.  In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow.  We are continuing to focus on MS sales. The commercial team is highly motivated, highly incentivized and highly productive.
>
> Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts.  We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

28.    On July 29, 2011, Questcor filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 13 -

Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

29.    In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $14.7 million for the three months ended June 30, 2011, as compared to $6.0 million for the three months ended June 30, 2010. The increase of $8.7 million in 2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build-on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists who treat patients for MS or IS, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we are significantly expanding our NS selling effort. Specifically, we are in the process of hiring approximately 23 additional representatives for our Nephrology Sales Force and we are giving a limited supportive selling role to our 77 representative Specialty Sales Force.

30.    On October 25, 2011, Questcor issued a press release announcing financial results for its third quarter ended September 30, 2011. For the quarter, the Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million, as compared to net income of $11.5 million, or $0.18

diluted EPS, and net sales of $31.3 million for the same period a year ago.  The

release stated the following in relevant part:

> "Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

> "Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

31.     After issuing its third quarter 2011 financial results on October 25,

2011, Questcor hosted a conference call where Defendants reiterated the

financial results reported in the Company's press release and Defendant Mulroy

discussed the Company's financial performance in depth.  Defendants Bailey

and Cartt represented the following in relevant part:

> [CARTT:]  [W]e shipped 886 paid Acthar prescriptions for the treatment of MS relapses during the third quarter of 2011. This was an increase of 174% over the year ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.

> * * *

Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the Annual Meeting of the American Society of Nephrology or ASN held this year in Philadelphia. These abstracts are available on ASN's website www.asn-online.org. The new data provides further insight into the immune modulating and other therapeutic properties of Acthar specifically relating to kidney disease.

We believe the availability of this data provides further evidence for the direct action of Acthar on kidney disease. And importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology. Our emerging understanding of the apparent immune modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

32.   On October 27, 2011, Questcor filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.   In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

Selling and marketing expenses were $13.7 million for the three months ended September 30, 2011, as compared to $7.7 million for the three months ended September 30, 2010. The increase of $6.1 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs and costs associated with our expanded

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 16 -

sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we have significantly expanded our NS selling effort. Specifically, we have hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to our 77 representative Specialty Sales Force.

34.     On January 11, 2012, *TheStreetSweeper.org* issued an article stating that it would publish the first part of a two-part investigative series about Questcor in the following week.  The article stated the following in relevant part:

The first article raises serious questions about the aggressive marketing practices that QCOR has used to generate explosive – but potentially unsustainable – growth in prescriptions for its only drug while the second story further examines QCOR's business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy.

35.     In response to the *StreetSweeper* article, Questcor's stock price dropped $6.20 per share or nearly 15%, to close at $35.34 per share on January 11, 2012.

36.     On January 11, 2012, Questcor issued a press release entitled "Questcor Pharmaceuticals Issues Statement," which stated in relevant part:

Questcor   Pharmaceuticals,   Inc.   (NASDAQ:   QCOR)   today announced it became aware that an investor blog is preparing to

issue a report regarding the Company's marketing and business practices. Questcor issued the following statement:

> The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices. Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

37.     On February 22, 2012, Questcor issued a press release announcing financial results for its fourth quarter and year ended December 31, 2011.  For the quarter, the Company reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million as compared to net income of $6.4 million, or $0.10 diluted EPS, and net sales of $29.3 million for the same period a year ago.  For the year, the Company reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million as compared to net income of $35 million, or $0.54 diluted EPS and net sales of $115.1 million for the same period a year ago.  The release stated in relevant part:

> "Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar

to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments."

38.   Also on February 22, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendants Bailey and Mulroy, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.   In connection with its marketing and promotion activities, the 10-K stated the following in relevant part:

Selling and marketing expenses were $56.7 million for the year ended December 31, 2011, as compared to $31.5 million in 2010 and $19.3 million in 2009. The increase of $25.2 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team and increased bonus compensation for other Company employees, and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial

Nephrology Sales Force was comprised of five representatives and, based on the results of their efforts, we significantly expanded our NS selling effort. Specifically, we hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to the 77 representatives in our Specialty Sales Force. While we have announced our intention to expand our MS and NS sales forces in 2012, our prescription growth trend may not continue and/or our sales force expansions intended for 2012 may not be successful. The process of significantly expanding a sales force in the biopharmaceutical industry is complex. We modify and re-allocate individual sales territories across our enlarged sales force, which can cause temporary disruptions in our selling efforts. Additionally, while the cost of our new sales representatives impacts our operating expenses immediately, there can be a delay in the expected ability of our new representatives to increase our net sales due to the time it takes for us to train the new representatives and for the new representatives to establish professional relationships with prescribing physicians within their territories.

40.     After issuing its fourth quarter and full year 2011 financial results, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

> [BAILEY:]  As we look ahead to 2012 and beyond, we believe we can sustain and re-grow our business due to three key factors. First, Acthar provides benefits to many difficult-to-treat patients, not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar while growing remains relatively small and third, we have [assembled an excellent,] experienced commercial team to pursue our growth plan.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 20 -

Our focus remains on helping patients with serious difficult-to-treat medical conditions.

* * *

[CARTT:]   A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbation or relapses, particularly in those patients not well served by steroid, which are generally considered first line therapy by most neurologists. This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS.

In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010. This is a 167% year-over-year increase. There were several factors behind this growth; positive patient outcome, increasing awareness among neurologists about how best to incorporate Acthar into their practices, continued excellent Acthar insurance coverage for MS relapses and the increase in productivity of our MS commercial team, all combined to generate this growth.

* * *

We believe that because Acthar provides real and substantial benefits to many patients who would otherwise continue to suffer the effects of serious, difficult-to-treat disorders, our growth should be sustainable.   We are expanding the Organization and associated infrastructure to address the significant growth opportunities in front of us.   At the same time, we are off to a good start to 2012, with January MS, NS, and IS paid prescription each having a good month.

41.    On April 24, 2012, Questcor issued a press release announcing financial results for its first quarter ended March 31, 2012.   The Company reported net income of $38.5 million, or $0.58 diluted EPS, and net sales of $96.0 million, as compared to net income of $11.2 million, or $0.17 diluted EPS, and net sales of $36.8 million for the same period a year ago.   The release stated the following in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 21 -

"While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor. "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."

42.    After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:]  Questcor's unconventional, but simple business model continues to produce excellent financial results. Shift files, net sales and earnings will all up well over 100% year-over-year. We continued to expand nephrologist and neurologist awareness, our patient benefits from Acthar and as a result, pay prescriptions continue to increase.

Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologist to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October. The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that by our calculation, nephrotic syndrome scrip value now exceeds MS.

* * *

[CARTT:]  Insurance reimbursements for Acthar and nephrotic syndrome continues to be very good with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome, if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options.

Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact data from one study at the University of Toronto is being presented just this week at the Canadian Nephrology Society Annual Meeting. This particular study found that about two thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy had their proteinuria drop by 50% or more due to Acthar treatment.

* * *

[YOUNG:]   As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug. While quite rare, there are, in effect, a few other successful examples of the type of product.  Soliris and Botox come to mind, for example. We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications.

In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs where we and others believe Acthar could provide a significant clinical benefit.

Currently, we have approximately 20 company-sponsored pre-clinical and clinical studies ongoing, and are supporting around 20 ongoing investigator-initiated studies.

43.    On April 26, 2012, Questcor filed a quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 23 -

changes to the Company's internal control over financial reporting.

44.    In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $21.7 million for the three months ended March 31, 2012, as compared to $11.3 million for the three months ended March 31, 2011. The increase of $10.5 million in 2012 as compared to 2011 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team, and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives, later increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and is currently being expanded to 58 representatives.

45.    On July 10, 2012, Citron Research issued an in-depth research report on Questcor.   Citron expanded on the *StreetSweeper.org* articles and further raised concerns about the Company's marketing strategy and a possible generic threat to Acthar.   The report discussed the competitive landscape for Acthar and was critical of the Company's assertions that there were significant barriers to entry into the market:   "[It] is evident that Questcor's Acthar label simply copies the language of the previously approved generic product label for ACTH – no sign of the 'secret sauce' the company's misleading language suggests."   Citron further questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms.   In addition, the research report analyzed

the Company's marketing expenses and questioned how the drug was being marketed to doctors: "The sales and marketing for HP Acthar Gel is now up to $6,100 a vial . . . **more than 5 X the original price of the drug before Questcor became involved.**" [Emphasis in original.]   The Citron report criticized Questcor for the lack of any meaningful research and development by the Company: "Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan," the report stated.  The Citron report was not only critical of the amount of insider selling over the past year but was also critical of its timing: "[W]henever we see **large insider selling at the same time the company is buying back large amounts of stock,** it is an ominous sign." [Emphasis in original.]

46.    On July 10, 2012, Questcor's common stock dropped $12.57 per share or nearly 22%, to close at $45.07 per share on July 10, 2012.

47.    On July 24, 2012, Questcor issued a press release announcing financial results for its second quarter ended June 30, 2012.  The Company reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million, as compared to net income of $13.9 million, or $0.21 diluted EPS, and net sales of $45.9 million for the same period a year ago.  The release stated in relevant part:

> "In the second quarter, we surpassed $100 million in quarterly net sales for the first time in our history," said Don M. Bailey,

President and CEO of Questcor.  "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists.  With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

48.     After issuing its second quarter 2012 financial results on July 24, 2012, Questcor hosted a conference call where Defendants reiterated the record financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost doubled the number of shipped vials in the quarter more than doubled net sales and tripled earnings from the year ago quarter. Paid scripts increased for both nephrotic syndrome and MS. We expanded two sales forces and starting building a third sales force in rheumatology using the same formula that works out well with MS and nephrotic syndrome. And we also made good progress in both our science and compliance programs.

* * *

[CARTT:]  Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients. This is not always the case, of course, not everyone responds, but clearly, many patients are benefiting significantly from this drug and there are few other treatment options available. All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 26 -

\* \* \*

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

\* \* \*

[YOUNG:]  As you can see by our operating results reported in today's press release we've been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects are objective that produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond the current on-label indications.

Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research. Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH and the clinical roles of Acthar Gel.

\* \* \*

In summary, I'd like to bring you back to my initial topic on our R&D efforts. We have previously reported our R&D efforts have been and are continuing to focus on three areas. First, producing its additional supporting data for the commercial team for on-label indications. Second, extending Acthar use -- Acthar Gel use beyond existing on-label indications in the following FDA processes. And third, our greatest priority, better understanding the unique chemical, biological and clinical characteristics of Acthar Gel.

Our research results from this third area thus far suggest that development of generic drugs of Acthar Gel is very challenging. All three areas of research are intended to advance the science of Acthar Gel in order to improve to help patients with devastating autoimmune and inflammatory diseases.

49.    On July 25, 2012, Questcor filed a quarterly report for the period

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 27 -

ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

50.     In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $27.6 million for the three months ended June 30, 2012, as compared to $14.7 million for the three months ended June 30, 2011 . The increase of $12.9 million in 2012 as compared to 2011 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that details Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and commenced activities in the second quarter of 2011. This sales force was increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and as of May 29, 2012 was expanded further to 58 representatives.

51.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company was disseminating false and misleading statements to the public as to the efficacy of its 60-year-old drug, Acthar, as a

treatment for multiple sclerosis and for nephrotic syndrome; (ii) the Company was marketing Acthar aggressively as a treatment for these conditions, with an inadequate compliance program to monitor such marketing; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Emerges

52.     On September 19, 2012, Citron reported that insurance giant Aetna had recently revised its policy to severely limit coverage of Questcor's primary drug, Acthar.  Aetna's findings concluded that clinical research supported only one of the 19 indications, that it was only "medically necessary" for treatment of West syndrome, a rare condition that causes infantile spasms, and not for other indications such as MS which are treated with steroids.  According to Aetna's Clinical Policy Bulletin:

I.      Aetna considers repository corticotropin (H.P. Acthar® Gel) medically necessary for West syndrome (infantile spasms)

II.     Aetna considers repository corticotropin not medically necessary for diagnostic testing of adrenocortical function because it has not been shown to be superior to cosyntropin for this purpose.

III.    Aetna considers repository corticotropin not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications.

IV.     Aetna considers repository corticotropin experimental and investigational for all other indications because its effectiveness for these indications has not been established.

***

ACTH Gel [such as Acthar] is rarely necessary for . . . corticosteroid-responsive conditions [including MS and nephrotic syndrome]. . . . In addition, there are a lack of clinical studies comparing the effectiveness of ACTH gel to corticosteroids in corticosteroid-responsive conditions. Also, because of uncertainties in the effect of ACTH gel on the magnitude of endogenous cortisol production, ACTH gel has the potential for inducing significant adverse effects.

53.   Later in the day, Questcor issued a press release entitled "Questcor Comments on Insurance Policy Bulletin," stated the following in relevant part:

The Company is continuing to review the Clinical Policy Bulletin related to Acthar from Aetna Inc. ("Aetna"). Currently, the Company does not believe that the bulletin represents a material change in insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar. Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

54.   On this news, Questcor's stock dropped $24.17 per share or nearly 48%, to close at $26.35 per share on September 19, 2012.

55.   On September 24, 2012, Questcor announced in a Form 8-K that the U.S. government had initiated an investigation into the Company's promotional practices.

56.   On this news, Questcor's stock dropped $11.05 per share, or almost 37%, to close at $19.08 per share on September 24, 2012.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 30 -

### Defendants' Duties

57.     By reason of their positions as officers, directors, and fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

58.     Defendants, because of their positions of control and authority as directors and officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company.

59.     To discharge their duties, the officers and directors of the Company

were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

a) exercise good faith to ensure the Company's affairs were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b) exercise good faith to ensure the Company operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c) when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

60.    Plaintiff brings this action derivatively in the right and for the benefit of Questcor to redress injuries suffered, and to be suffered, by Questcor as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Questcor is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

61.    Plaintiff will  adequately  and  fairly  represent  the  interests  of

Questcor and its shareholders in enforcing and prosecuting its rights.

62. Plaintiff is the owner of Questcor common stock and was the owner of Questcor common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

63. At the time that this action was commenced, the Questcor Board was comprised of, among others, the Individual Defendants.

64. As a result of the facts set forth herein, Plaintiff has not made any demand on the Questcor Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

    a.    Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

    b.    Questcor's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards. These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options. The following charts illustrate the substantial compensation that these directors have received, which demonstrates that demand upon such individuals would be futile:

| 2011 | | | | |
|---|---|---|---|---|
| **Executive** | **Base Salary** | **Options Awards** | **Non-Equity Incentive Plan Compensation** | **TOTAL** |
| Bailey | $584,8755 | $2,628,815 | $1,332,540 | $4,546,230 |
| Mulroy | $342,147 | $938,863 | $466,881 | $1,749,891 |
| Cartt | $389,917 | $1,126,635 | $781,756 | $2,298,308 |
| Young | $424,320 | $751,090 | $773,394 | $1,948,804 |

c.    The entire Questcor Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, Questcor's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced defendants breached the fiduciary duties they owed to Questcor and its shareholders in that they failed to prevent and correct the dissemination of the Company false and misleading statements.   Thus, the Questcor Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome because their actions have subjected Questcor to millions of dollars in potential liability for violations of applicable securities laws;

d. Individual Defendants certified certain of Questcor's SEC filings. Accordingly, demand is futile as he faces a substantial likelihood of liability for breach of fiduciary duties owed to Questcor;

e. Individual Defendants were aware of the Company's ongoing unlawful and improper business practices and the dissemination of materially false and misleading statements.

f. Defendants Thompson, Blutt, and Farrell served on Questcor's Audit Committee during the Relevant Period. Defendant Farrell was the chairman of Questcor's Audit Committee during the Relevant Period. The purpose of Questcor's Audit Committee was to assist the Board in fulfilling its oversight responsibilities for financial matters. Specifically, the Audit Committee was to assist the Board in: (1) identifying and recommending to the Board individuals qualified to become members of our Board and to fill vacant Board positions; (2) recommending to the Board the director nominees for the next annual meeting of shareholders; (3) recommending to the Board director committee assignments; (4) recommending to the Board the compensation for Company directors; (5) reviewing and evaluating succession planning for our Chief Executive Officer and other executive officers; (6) monitoring the continuing education program for our directors; and (7) evaluating annually the Nominations and Corporate Governance Committee charter. The Audit Committee, moreover, is responsible for oversight

of the Company's financial reporting process, including the effectiveness of the Company's internal accounting and financial controls and procedures, and controls over the accounting, auditing, and financial reporting practices. Additionally, the Audit Committee met privately, outside the presence of Questcor's management, with the Company's independent registered public accounting firm to discuss, among other matters, all communications required by standards of the Public Company Accounting Oversight Board, including the matters required to be discussed by PCAOB AU 380, *Communication with Audit Committees*, and Rule 2-07, *Communication with Audit Committees*, of Regulation S-X. As part of its oversight role with respect to the Company's financial statements and the public disclosure of the Company's financial results, moreover, the Company's Audit Committee regularly reviewed and discussed with Questcor's management the financial statements included in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, its quarterly earnings releases, and the financial guidance that the Company provided to analysts, ratings agencies, and the public. The Audit Committee also met regularly in separate executive sessions with Questcor's CFO, Chief Accounting Officer, and other members of the Company's executive management team. As a result, Defendants Thompson, Blutt, and Farrell knew, or should have known, of the Company's wrongdoing alleged herein, but intentionally or recklessly violated

their duties as members of the Audit Committee.  Specifically, because of these duties and responsibilities – particularly the Audit Committee's responsibility to discuss the Company's financial information and earnings guidance with Questcor's management prior to release – members of the Audit Committee were aware that Questcor's positive statements about the Company's prospects and growth were made without a reasonable basis.  Indeed, through such discussions with Questcor's management, the Audit Committee was aware or should have been aware of the significant problems with Acthar. Further, the Audit Committee was aware or should have been aware that these processes lacked effective supervision and oversight and the Company's operating efficiencies had been hindered.  As such, Defendants breached their fiduciary duties of loyalty and good faith to the Company.  Additionally, the failure of the Individual Defendants to perform their duties as members of the Audit Committee with loyalty and in good faith raises a substantial likelihood of non-exculpated personal liability on their part.  As a result, the Individual Defendants cannot impartially consider a demand on the Board to commence litigation against themselves;

g. Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

h. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

i. In order to bring this suit, all of Questcor's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

j. The acts complained of constitute violations of the fiduciary duties owed by Questcor's officers and directors and these acts are incapable of ratification;

k. Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

l. Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and Questcor to further violations of the securities laws that would result in civil actions being filed against one or

more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

m. Questcor has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Questcor any part of the damages Questcor suffered and will suffer thereby; and

o. If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

p. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for Questcor for any of the wrongdoing alleged by plaintiff herein.

65.     Plaintiff, moreover, has not made any demand on shareholders of Questcor to institute this action since demand would be a futile and useless act for the following reasons:

a.     Questcor is a publicly held company with over 59.6 million shares outstanding, and thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders; and

c.     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

66.     Furthermore, the conduct complained of herein could not have been the product of good faith business judgment, and each of these directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected Questcor to substantial damages.  Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class action entitled *Lee Beng Heng v. Questcor Corporation*, Civil Action Number 8:2012-cv-01707, pending in the United States District Court for the Central District of California.   Through their intentional misconduct, Individual Defendants have subjected the Company to potential costs, fines, and judgments

1  associated with the securities class action.   Such actions by the Individual

2  Defendants cannot be protected by the business judgment rule.   Accordingly,

3
4  making a pre-suit demand on the Individual Defendants would be futile.

5  **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

6
7  67.   Plaintiff brings this action as a class action pursuant to Federal Rule

8  of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those

9
10  who purchased or otherwise acquired Questcor securities during the Class Period

11  (the "Class"); and were damaged thereby.   Excluded from the Class are

12  defendants herein, the officers and directors of the Company, at all relevant

13
14  times, members of their immediate families and their legal representatives, heirs,

15  successors or assigns and any entity in which defendants have or had a

16  controlling interest.

17
18  68.   The members of the Class are so numerous that joinder of all

19  members is impracticable.   Throughout the Class Period, Questcor securities

20
21  were actively traded on the NASDAQ.   While the exact number of Class

22  members is unknown to Plaintiff at this time and can be ascertained only through

23
24  appropriate discovery, Plaintiff believes that there are hundreds or thousands of

25  members in the proposed Class.   Record owners and other members of the Class

26  may be identified from records maintained by Questcor or its transfer agent and

27
28  may be notified of the pendency of this action by mail, using the form of notice

similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the defendants' acts as alleged herein constitute breaches of fiduciary duties;

- whether statements made by defendants to the investing public during the relevant period misrepresented material facts about the business, operations and management of Questcor;

- whether the Individual Defendants caused Questcor to issue false and misleading financial statements during the relevant period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Questcor securities during the relevant period were artificially inflated because of the defendants' conduct complained of herein;

- whether defendants actions constitute gross mismanagement, and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)**

73.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

74.    Defendants owed a fiduciary duty to Questcor to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and they such filings conformed to applicable securities laws.  Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Questcor's internal controls and by allowing the Company to issue and disseminate misleading statements and filings.

75.    Defendants have engaged in a sustained and systematic failure to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 43 -

exercise their oversight responsibilities and to ensure that Questcor complied with applicable laws, rules and regulations.

76.     As members of the Questcor Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of them had knowledge of and actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing. The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

77.     Each of defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company. As a result of defendants' breaches, Questcor is the subject of a major securities fraud class action lawsuit by defrauded investors, and the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

78.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

79.   Defendants had a duty to Questcor and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Questcor in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence, and candor in the management and administration of Questcor's affairs and in the use and preservation of the Company's assets.

80.   During the course of the discharge of their duties, defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, defendants caused Questcor to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged Questcor, thereby causing damage to the Company.

1

## COUNT III
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION
## AND INDEMIFICATION)

2

3

4

81.   Plaintiff incorporates by reference each of the preceding paragraphs

5

as though they were set forth in full herein.

6

82.   Questcor is alleged to be liable to various persons, entities and/or

7

8

classes by virtue of the facts alleged herein that give rise to defendants' liability

9

to the Company.

10

83.   Questcor's alleged liability on account of the wrongful acts,

11

12

practices, and related misconduct alleged arises, in whole or in part, from the

13

knowing, reckless, disloyal and/or bad faith acts or omissions of defendants, and

14

15

the Company is entitled to contribution and indemnification from each defendant

16

in connection with all such claims that have been, are, or may in the future be

17

18

asserted against Questcor, by virtue of the Individual Defendants' misconduct.

19

## COUNT IV
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF
## CONTROL)

20

21

22

84.   Plaintiff incorporates by reference each of the preceding paragraphs

23

24

as though they were set forth in full herein.

25

85.   The Individual Defendants' conduct, as alleged herein, constituted

26

an abuse of their control over Questcor.

27

28

86.   As a direct and proximate result of the Individual Defendants' abuse

1   of control, the Company has suffered, and will continue to suffer, damages for

2   which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate

3
    remedy at law.
4

5                              **COUNT V**

6            **(AGAINST THE INDIVIDUAL DEFENDANTS FOR**
                    **WASTE OF CORPORATE ASSETS)**
7

8           87.    Plaintiff incorporates by reference each of the preceding paragraphs
9
10   as though they were set forth in full herein.

11          88.    The Individual Defendants' conduct, as alleged herein, constituted a
12
13   waste of the corporate assets of Questcor.

14          89.    As a direct and proximate result of the Individual Defendants' abuse
15
16   of control, the Company has suffered, and will continue to suffer, damages for

17   which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate
18
     remedy at law.
19
20                        **PRAYER FOR RELIEF**
21          WHEREFORE, Plaintiff prays for judgment as follows:
22
23   a.     Against all of the Individual Defendants and in favor of the Company
             for the amount of damages sustained by the Company as a result of
24           the Individual Defendants' breaches of fiduciary duties;

25   b.     Awarding to plaintiff the costs and disbursements of the action,
26           including reasonable attorneys' fees, accountants' and experts' fees,
             costs, and expenses; and
27
28   c.     Granting such other and further relief as the Court deems just and
             proper.

                VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
                                    - 47 -

# JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 11, 2012                    THE WAGNER FIRM

                                           By: _____
                                           Avi Wagner
                                           1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
                                           Telephone: (310) 491-7949
                                           Facsimile: (310) 694-3967
                                           Email: avi@thewagnerfirm.com

                                           Patrick W. Powers
                                           Zachary Groover
                                           POWERS TAYLOR LLP
                                           8150 North Central Expressway
                                           Suite 1575
                                           Dallas, Texas 75206
                                           Phone:  214.239.8900
                                           Fax:    214.239.8901
                                           zach@powerstaylor.com
                                           patrick@powerstaylor.com

                                           Willie C. Briscoe
                                           THE BRISCOE LAW FIRM, PLLC
                                           8117 Preston Road, Suite 300
                                           Dallas, Texas 75225
                                           Phone: 214.706.9314
                                           Fax: 214.706.9315
                                           wbriscoe@thebriscoelawfirm.com

                                           *Counsel for Plaintiff*

**VERIFICATION OF COMPLAINT**

I, _Nilabrata Goswami_, am the named plaintiff in this action brought

derivatively on behalf of Questcor Pharmaceuticals, Inc.  I have read this verification as

well as the Verified Shareholder Derivative Complaint.  As to those allegations of which I

have personal knowledge, I believe them to be true.  As to those allegations of which I

do not have personal knowledge, I rely on my counsel and their investigation and for

that reason believe them to be true.  I am a current Questcor Pharmaceuticals, Inc.

shareholder and have been a Questcor Pharmaceuticals, Inc. shareholder throughout

the period in which the wrongful conduct as alleged in this complaint occurred.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10_ day of October, 2012 at _Garland_ , Texas.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1753 CJC  (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [✓] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Avi Wagner (SBN 226688)
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 491-7949

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NILABRATA GOSWAMI, Individually and On Behalf of All Others Similarly Situated, <br><br> PLAINTIFF(S) <br><br> v. <br><br> Don M. Bailey, Michael H. Mulroy, Stephen L. Cartt, David Young, Virgil D. Thompson, Mitchell J. Blutt, Stephen C. Farrell & Questcor Pharmaceuticals, Inc. <br><br> DEFENDANT(S). | CASE NUMBER <br><br> SACV12 1753 CJC (MLGx) <br><br><br> **SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  Avi Wagner _____ , whose address is  THE WAGNER FIRM, 1925 Century Park East, Suite 2100, Los Angeles, CA 90067 ____ .  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

OCT 1 1 2012

Clerk, U.S. District Court

Dated: _____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Avi Wagner (SBN 226688)
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 491-7949

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NILABRATA GOSWAMI, Individually and On Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br>v.<br>Don M. Bailey, Michael H. Mulroy, Stephen L. Cartt, David Young, Virgil D. Thompson, Mitchell J. Blutt, Stephen C. Farrell & Questcor Pharmaceuticals, Inc.<br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV12 1753 CTT (MLGx)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney,  Avi Wagner _____ , whose address is THE WAGNER FIRM, 1925 Century Park East, Suite 2100, Los Angeles, CA 90067 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

OCT 1 1 2012                          Clerk, U.S. District Court

Dated: _____        By: _____ **JULIE PRADO** _____
                                          Deputy Clerk
                                                      1154

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Nilabrata Goswami, Individually and On Behalf of All Others Similarly Situated,

**DEFENDANTS**
Don M. Bailey, Michael H. Mulroy, Stephen L. Cartt, David Young, Virgil D. Thompson, Mitchell J. Blutt, Stephen C. Farrell & Questcor Pharmaceuticals, Inc.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Avi Wagner (SBN 226688), THE WAGNER FIRM, 1925 Century Park East, Suite 2100, Los Angeles, California 90067, Telephone: (310) 491-7949

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Section 1332(a)(2) - Breach of Fiduciary Duty, Gross Mismanagement, Contribution & Indemnification, Abuse of Control, Waste of Corporate Assets

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

SACV12 1753

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                          CIVIL COVER SHEET                          Page 1 of 2

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
   ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
   ☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Plaintiff Nilabrata Goswami - Texas |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
   ☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Defendants Don M. Bailey, Michael H. Mulroy, Stephen L. Cartt, David Young, Virgil D. Thompson, Mitchell J. Blutt, Stephen C. Farrell & Questcor Pharmaceuticals, Inc. - Anaheim, CA | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER:** _(signature)_                 Date October 11, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |